**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Larry Menkes | : | **CIVIL ACTION** |
| Jacquelyn Menkes | : | |
| | : | |
| Plaintiffs, | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |
| Vs. | : | |
| | : | **NO: 2:17-cv-573** |
| | : | |
| 3M Company (f/k/a Minnesota Mining and | : | |
| Manufacturing Company) | : | |
| Angus Fire (a/k/a Angus International) | : | |
| Ansul (a/k/a Ansul Chemical Company; a/k/a | : | |
| The Ansul Company a/k/a Ansul Fire | : | |
| Protection | : | |
| Buckeye Fire Equipment Company | : | |
| Chemguard, Inc. | : | |
| | : | |
| Defendants | : | |

## Plaintiffs First Amended Complaint

**Plaintiffs**

1.  Plaintiff Larry Menkes is an individual residing at 741 Clifford Street in Warminster, PA.

2.  Plaintiff Jacquelyn Menkes is the wife of Larry Menkes and resides with him at the above
    named address.

3.  Plaintiffs have continuously lived in Warminster at 741 Clifford Street since the Spring of
    1987.

**<u>Defendants</u>**

4.  Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company)
    ("3M") is a corporation organized and existing under the laws of the state of Delaware,
    having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

5.  Defendant Angus Fire (a/k/a Angus International) ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom.  Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, NC  27501.

6.  Defendant, Ansul (a/k/a Ansul Chemical Company; a/k/a The Ansul Company a/k/a Ansul Fire Protection) (hereinafter "Ansul") is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI  54143.

7.  At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

8.  Defendant, Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, NC 28086.

9.  At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

10. Chemguard, Inc. is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI  54143.

11. At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

**Jurisdiction**

12. This court has jurisdiction due to diversity of citizenship under 28 U.S. §1332 and the amount in controversy exceeds $75,000.

## GENERAL FACTUAL ALLEGATIONS

13. All allegations, supra are incorporated herein as if specifically set forth herein at length.

14. Poly-and perfluorinated alkyl substances (hereinafter referred to as PFASs) have been in use for over sixty (60) years.

15. In the 1940s and 1950s, Defendant, 3M Company, began creating perfluorochemicals (PFCs) and began incorporating them into its products.

16. Perfluoroctanesulfonic acid ("PFOS") and perfluoroctanoic acid ("PFOA") are the two (2) most prevalent compounds of PFCs.

17. In the early 1960s, Defendant 3M Company engineered, designed and developed its aqueous film forming foam (AFFF) using the surfactant containing PFCs and began to market it under the brand name "Light Water$^{TM}$".

18. The AFFF contained PFCs including PFOS and related fluorochemicals that can degrade to PFOA or PFOS.

19. Defendant, 3M Company, promoted and sold the AFFF for the purposes of preventing, suppressing and extinguishing fires involving aviation fuel and other flammable liquids.

20. Through at least 2002, 3M manufactured and sold the AFFF containing PFCs and fluorocarbon surfactants.

21. Defendants, Ansul, Buckeye, and Chemguard also engineered, developed, manufactured, marketed, and sold AFFF contained PFCs including PFOS and related fluorochemicals that can degrade to PFOA or PFOS.

22. PFOS and PFOA have unique chemical properties that cause them to be classified as persistent, bioaccumulative, and toxic.

23. Bioaccumulation occurs when an organism absorbs a possibly toxic substance at a rate faster than that at which the substance is lost by metabolism and excretion.

24. Due to the strength of multiple carbon-fluorine bonds, PFOS and PFOA are chemically stable in the environment and resistant to environmental biodegradation processes. There are no known biological organisms or processes that are able to naturally degrade PFOS or PFOA.  This persistence makes them an environmental hazard. PFOS persists in the environment indefinitely.

25. PFOS and PFOA can remain in the environment for decades or indefinitely, leach through soil, and infiltrate and pollute groundwater and the environment.

26. Once water is contaminated by PFOS or PFOA, it cannot be removed by boiling the water or using chlorine and other disinfectants that are typically added to public drinking water systems.

27. Toxicology studies show that PFOS and PFOA are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

28. PFOS and PFOA can cross the placenta from mother to fetus and from mother to infant through breast feeding.

29. Once ingested, PFOS and PFOA have a half-life within the human body of up to 9 years.

30. PFOS and PFOA are toxic and have negative health effects on humans.

31. There are a number of health risks associated with exposure to PFOS and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels (less than 1 part per billion).

32. PFOS and PFOA exposure is associated with increased risk of various diseases and cancers in humans, including, but not limited to:  testicular cancer, bladder cancer, kidney cancer, prostate cancer, multiple myeloma, disorders such as hyperthyroidism, hypothyroidism, high cholesterol, ulcerative colitis, pregnancy-induced hypertension, non-Hodgkin lymphoma, and increased uric acid..

33. In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."

34. Injuries, however, are not sudden; rather, they can arise months, years or decades after exposure to PFOS and/or PFOA.

35. The Defendants also knew or should have known that PFCS are highly soluble in water, and highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

36. The Defendants marketed and sold their products, AFFF, with knowledge that large quantities of their toxic, harmful and defective product, AFFF, would be used in training exercises and in emergency situations at Military bases and civilian fire facilities in such a manner that dangerous chemicals would be released into the environment.

37. As discussed in more detail below, PFOS and PFOA contamination has been discovered in the wells of and area surrounding the Naval Air Station Joint Reserve Base – Willow Grove (hereafter referred to as NASJRB-Willow Grove) and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville).  Hereinafter referred to as "Affected Area." NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville) are hereinafter referred to as "Bases".

38. Plaintiffs reside in the Affected Area adjacent to the Bases, and public water supply wells owned by the Warminster Municipal Authority are also in the Affected Area..

39. The Warminster Municipal Authority provides Plaintiffs' drinking/potable water, and its water supply was contaminated with PFOS, PFOA and other PFC contamination resulting from the use of AFFF at the bases.

40. Upon information and belief, the PFOS and PFOA contamination of the public and private wells and Plaintiffs' drinking/potable water supply is the result of the discharge of AFFF manufactured by the Defendants and used on the Bases.

MILITARY SPECIFICATION FOR AFFF

41. In 1969, the Department of the Navy issued Military Specification MIL-F-24385 for AFFF.

42. In order for an AFFF manufacturer to sell its AFFF to the Navy, it was required to meet MIL-F-24385.

43. MIL-F-24385 covered "the requirements for aqueous film-forming foam(AFFF) liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds as required to conform to the requirements specified hereafter.

44. If the Navy found that a manufacturer's product satisfied MTL-F-24385 performance expectations, the Navy placed the product on the Department of Defense Qualified Product Listing.

45. 3M, Angus, Ansul, Buckeye, and Chemguard each engineered, designed, manufactured, distributed and sold AFFF that was included on the Department of Defense Qualified Product Listing for MIL-F-24385.

46. In its Military Specifications (a/k/a and hereinafter referred to as "MILSPEC") for Fire Extinguishing Agent, Aqueous Film Forming Foam (AFFF), the United States of America, through its said Agencies, required that "The material shall have no adverse effect on the health of personnel when used for its intended purpose." This provision remained a part of the specification throughout the time defendants sold AFFF products to the U.S. government.

47. 3M, Angus, Ansul, Buckeye, and Chemguard each chose to include PFOS and PFOA as ingredients in their MIL-F-24385-compliant AFFF.

48. The inclusion of PFOA and PFOS in AFFF sold pursuant to MIL-F-24385 violated the specification that "The material shall have no adverse effect on the health of personnel when used for its intended purpose."

49. The said AFFF was sold to the US Navy, US Air Force, and Pennsylvania Air National Guard for use on its various and numerous naval vessels and at military bases including NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville). (NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville are hereinafter referred to as "Bases").

7

50. Defendants knew or should have known that their harmful and defective products, AFFF, would be used for various purposes on said Bases, including, but not limited to, training for firefighting, actual firefighting, and use in hangar sprinkler fire suppressant systems, which would cause the AFFF to drain into the ground and eventually pollute or contaminate the ground water beneath the Bases and eventually migrate into the drinking/potable water of the Plaintiffs.

51. The harmful and defective products, AFFF, manufactured by the Defendants contained PFOS, PFOA, and/or certain other perfluorinated compounds ("PFC") that degrade into PFOS or PFOA.

52. The Defendants manufactured and/or sold their harmful and defective products, AFFF, when they knew or should have known that their products had an adverse effect on the health of persons when used for its intended purposes.

53. The Defendants failed to warn about the adverse and harmful health effects of their harmful and defective AFFF products, when they knew or should have known that their products had an adverse effect on the health of persons when used for its intended purposes.

54. While using AFFF for its intended purposes, the said harmful and defective products were released into the environment contaminating the soil and groundwater of the bases and migrated into the groundwater and eventually into the drinking/potable water of the Plaintiffs.

55. It was reasonably foreseeable to Defendants that Plaintiffs, as users of groundwater that supplied the wells near the Bases, would use and consume groundwater contaminated by their products at the Bases and would be harmed as a result.

8

56. In the 1970s-1980s, the Defendants were well aware of the health risks and adverse human health effects of exposure to the harmful and defective products which contained PFOA and PFOS.

57. Despite this knowledge, the Defendants continued to manufacture, market and/or sell their defective AFFF, without warning and/or sufficiently warning consumers, purchasers and users of the health risks and/or adverse human effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

58. The Defendants, as the manufacturers of AFFF, knew or should have known that the inclusion of PFOS, PFOA and related fluorochemicals that degrade to PFOA or PFOS in AFFF presented an unreasonable risk to human health and the environment.

**AFFF Use at the Willow Grove and Warminster Bases**

59. At any given time during their operation, the Bases housed thousands of gallons of AFFF concentrate manufactured by Defendants, which were/are stored in buckets, drums, tankers and sprinkler systems.

60. U.S. Navy, Air National Guard, Marines, and Air Force (hereinafter referred to collectively as "Military") personnel, as well as civilian firefighters, conducted training exercises at the Bases.

61. In part, the Military and civilian firefighters engaged in firefighting and explosion training that required the use of AFFF.

62. For decades, firefighting training activities took place at the two military Bases.

9

63. Each site also possessed and maintained aircraft hangars protected by ceiling fire suppression units holding hundreds of gallons of AFFF.

64. The use of AFFF for training purposes included suppression fires and explosions on the ground, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil.

65. Accidental discharges occasionally occurred within the aircraft hangers resulting in the discharge of hundreds of gallons of AFFF. The personnel at the Bases cleaned the hangars by washing the foam down drains which leached into the ground water which provided drinking/potable water to; including the Plaintiffs.

66. Once the ground water of the bases was contaminated and polluted with PFOA and PFOS, military and civilian personnel on the base became exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc.

67. The polluted and contaminated ground water found its way into the aquifer and into the drinking/potable water of the areas identified, supra; including the Affected Area.

68. Once PFOA and PFOS contaminated and polluted the drinking/potable water of the Affected Area, military and civilian personnel stationed on the bases were exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc. while living in the areas off the bases and/or while eating, drinking, etc. in restaurants, cafes, homes of friends, etc. in the said areas.

69. Once PFOA and PFOS contaminated and polluted the drinking potable water in the Affected Area near the bases, the residents of said areas, including plaintiffs, were exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc. while living and

10

working in the said areas and/or while eating, drinking, etc. in their homes, the homes of friends, restaurants, cafes, etc. in the said areas.

70. At all times material hereto the individuals ingesting the polluted and contaminated water/food/sustenance, including plaintiffs, were unaware that they were consuming/ingesting polluted and contaminated substances containing PFOA and PFOS.

71. Upon information and belief, instructions and warnings supplied with the AFFF sold by the Defendants did not adequately describe the dangers associated with use and disposal of AFFF.

72. In 2002, 3M ceased production of AFFF manufactured with PFOS due to health and environmental concerns.

73. Upon information and belief, 3M and the other defendants had known of these dangers for years, if not decades, before ceasing manufacture.

74. Even though 3M, who was the predominant manufacturer of PFOS-based AFFF, ceased production of PFOS-based AFFF in 2002, neither 3M nor any other Defendant that used these chemicals recalled its dangerous products.

75. Consequently, upon information and belief, Military personnel and civilians at the Bases continued to use PFOS-laden AFFF for trainings and emergencies until the base closed in 2011.

76. According to one study, as of 2011, there were still 1,972,000 gallons of PFOS-based AFFF stockpiled in the United States.

77. Further, upon information and belief, the Military continues to store the PFOS-based AFFF on the Bases.

11

**Regulatory Action for Safe Drinking Water**

78. In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3").  By placing PFOS and PFOA on this list, the EPA required certain water providers across the country, including those in the Affected Area, to test their water for the presence of PFOA and PFOA.

79. Between November 2013 and June 2014, the Warminster Municipal Authority tested its wells in compliance with UCMR3.  The testing showed PFOS levels ranging from 40 ppt to 1090 ppt and PFOA levels ranging from 20 ppt to 890 ppt.  The Warminster Municipal Authority closed six of its wells due to PFOS and/or PFOA contamination; including well(s) servicing Plaintiffs.

80. The Warminster Municipal Authority water system is an interconnection of wells, water mains and tanks. At any point in the system, water will come from multiple wells.

81. As of August 23, 2016, all Warminster Municipal Authority wells still  contained PFCs at varying levels.

82. In May 2016, the EPA set its Health Advisory for Lifetime Exposure at 70 ppt for the sum of PFOA and PFOS concentrations in drinking water.

83. Other states and/or organizations have suggested limiting exposure to even lower levels of PFOS and/or PFOA.

84. Certain states have also promulgated advisory exposure levels lower than the EPA's advisory level, including the State of New Jersey, which promulgated and advisory exposure level for FOA of 14 ppt and the State of Vermont, which set its enforcement standard at 20 ppt for PFOA and 30 ppt for PFOS.

85. Negative health outcomes, including but not limited to the cancers and diseases in paragraph 33 were linked with exposure to PFOA-contaminated drinking water at or above 50 ppt in a scientific study of over 50,000 residents in and around Parkersburg, West Virginia.

86. As a result of their exposures to Defendants'  PFC's in drinking water, Plaintiffs are at an increased  risk of contracting a serious latent disease, including but not limited to: testicular cancer, (for Larry Menkes only)  bladder cancer,  (for Jacqueline Menkes only) kidney cancer, prostate cancer, multiple myeloma, disorders such as hyperthyroidism, hypothyroidism, high cholesterol, ulcerative colitis, non-Hodgkin lymphoma, and increased uric acid,.

87. There are monitoring procedures available that make the early detection of these diseases possible, and these procedures are different from what is normally recommended in the absence of exposure.  For instance  A  panel of distinguished physicians  recommended  that medical testing, monitoring, and screening for these conditions was reasonably necessary for all Parkersburg, West Virginia residents exposed to PFOA-contaminated drinking water above 50 ppt, regardless of prior exposures. A copy of this suggested protocol is attached.

88. Plaintiffs were exposed to PFOA-contaminated drinking water well in excess of 50 ppt.

89. The monitoring regime sought by the plaintiffs in this case is reasonably necessary according to contemporary scientific principles.

90. As a result of the testing performed after the EPA's May 2016 Lifetime Health Advisories were issued for PFOS and PFOA, numerous residents, including Plaintiffs learned that their drinking/potable water supply was contaminated with dangerous levels of PFOS and/or PFOA.

13

91. The United States of America, through the Department of the Navy, has offered assistance to several impacted residents, but its efforts are too little, too late.

92. The contamination of the public and private drinking/potable water wells in the Affected Area surrounding the Bases with high concentration levels of PFOS and PFOA resulted from the Defendant's manufacture of AFFF through the use of the defective/harmful product on the Bases.

93. As set forth herein, Despite said knowledge, the Defendants continued to manufacture, market, sell and/or introduce into the stream of commerce their harmful and defective products, AFFF, without warning and/or sufficiently warning consumers, purchasers, users and reasonably foreseeable innocent bystanders, such as Plaintiffs, of the health risks and/or adverse human health effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

94. Since 2014, many private and public drinking/potable drinking water wells tested within the Affected Area, including those which supplied plaintiffs,  have shown concentrations of PFOS and PFOA well above the EPA's Lifetime Health Advisory for Lifetime Exposure of 70 ppt.

95. Multiple studies suggest that even small concentrations of PFCs are harmful to humans.

## COUNT I

### Negligence

96. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

97. The Defendants had a duty to design, engineer, manufacture, develop, fabricate, test, sell, and/or distribute AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

98. As discussed, supra, Defendants knew or should have known that the manufacture, distribution and sales of AFFF containing PFOS and PFOA was hazardous to human health and the environment.

99. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture, distribute and sell AFFF containing PFOS and PFOA because it was inevitable that said harmful and defective products migrate off of the Bases and contaminating the ground water and potable/drinking water supply of the Bases and Affected Area.

100. The Defendants also knew or should have known that PFCs are highly soluble in water, and highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released to the environment.

101. The Defendants marketed and sold their products, AFFF, with knowledge that large quantities of their toxic, harmful and defective product, AFFF, would be used in training exercises and in emergency situations at Military bases in such a manner that dangerous chemicals would be released into the environment.

102. The harm caused by the Defendants' harmful and defective products to Plaintiffs was reasonably foreseeable.

103. The drinking/potable water of the public and private wells in the Affected Area are contaminated with unsafe levels of PFOS and PFOA.

104. As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, both the public and private drinking/potable water supplies in the Affected Area are contaminated with PFOS and PFOA.

105. Plaintiffs receive drinking/potable water from sources in the Affected Area contaminated with unsafe levels of PFOS and PFOA.

106. Defendants' failure to warn/sufficiently warn of the effects of their harmful and defective products resulted in the contamination of private and public drinking/potable water supplies with PFOS and PFOA.

107. Plaintiff Larry Menkes was diagnosed with bladder cancer in 2011 which resulted from his exposure to PFCs in Warminster's public water supply.

108. Contamination of Warminster's water supply by toxic levels of PFCs was not publicly known until less than two years before the filing of this lawsuit.  Before that time Plaintiff did not have reason to believe that his bladder cancer could have come from consuming water contaminated with the Defendants' PFCs.

109. As a result of Defendants' negligence, Plaintiff Larry Menkes suffered Bladder cancer, incurred substantial medical bills, a loss of earnings and impairment of earning capacity, great pain, suffering and mental distress.

110. As a further result of Defendants' negligence, Plaintiff Jacquelyn Menkes suffered a loss of her husband's companionship and consortium.

## COUNT II

### Defective Product – Failure to Warn

111. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

112. At all times relevant, Defendants were in the business of, among other things, designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing AFFF.

113. As designers, engineers, manufacturers, developers, fabricators, testers, sellers, and/or distributers of a commercial product, the Defendants had a duty to provide reasonable instructions and adequate warnings about the risks of injuries and harmful effects to human health and the environment posed by their products.

114. Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they designed, engineered, developed, fabricated, tested, manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health, property and the environment.

115. These risks were not obvious to users of the AFFF.

116. Defendants failed to provide warnings to the users that the use of Defendants' harmful and defective product could result in the contamination of groundwater and drinking/potable water supplies.

117. Defendants failed to provide warnings to the users of the dangers to human health, property and the environment if their harmful and defective product was permitted to contaminate the groundwater or drinking/potable water supply.

118. Sufficient and adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the Defendants' harmful and defective products.

17

119. Had Defendants provided adequate warnings, the users of their AFFF would have taken adequate measures to store, use, and dispose of AFFF so as to reduce or eliminate groundwater and drinking/potable water contamination from AFFF.

120. As a result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking/potable water became contaminated with toxic PFOS and PFOA.

121. As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by their harmful and defective product, AFFF, Plaintiffs have suffered injuries as aforesaid.

122. As a direct and proximate result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or manufacturing, or distributing of a defective product, Plaintiffs have suffered and continue to suffer injuries as aforesaid.

## COUNT III

### Defective Product – Design Defect

123. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

124. At all times relevant, Defendants were in the business of, designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing AFFF.

125. Defendants negligently designed, engineered, developed, fabricated and tested AFFF and PFCs, and thereby failed to exercise reasonable care to prevent the AFFF and the components from presenting an unreasonable risk of harm to human health and the environment and persons who would come in contact with it, including Plaintiffs.

18

126. It was foreseeable that toxic chemicals from the AFFF that Defendants designed, engineered, developed, fabricated, tested, manufactured, sold and distributed would enter the water supply of the Plaintiffs and cause harm to their persons, and property and the environment.

127. Alternative designs of AFFF were available, technologically feasible and practical, and would have reduced or prevented the harm to Plaintiffs.

128. A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF.

129. The AFFF designed, engineered, developed, fabricated and tested manufactured, sol, or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design.

130. Defendants' products were defective at the time of manufacture, and at the time they left Defendants' control.

131. As a result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing designed product, the drinking/potable water supplies in and around the Bases became contaminated with dangerous and toxic chemicals and damaged the Plaintiffs.

132. As a direct and proximate result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or manufacturing, or distributing of a defective product, Plaintiffs have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment,

remediation, and monitoring of their drinking/potable water; increased costs of

drinking/potable water, economic loss, property damages, including, without limitation,

loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for

which Plaintiffs are entitled to recover damages.

133. As a result of Defendants' designing, engineering, manufacturing, developing, fabricating,

testing, selling, and/or distributing a defective produce, Defendants are strictly liable in

damages to the Plaintiffs.

134. Defendants' acts were willful, wanton or reckless and conducted with a reckless

indifference to the rights of Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against all defendants jointly and severely

liable in an amount in excess of $75,000.

**WILLIAMS CUKER BEREZOFSKY**


**By:**     */s/ Mark R. Cuker*_____ _____
         **MARK R. CUKER**
         **1515 Market Street, Suite 1300**
         **Philadelphia, PA  19102**
         **(215) 557-0099**

         ***Attorney for Plaintiffs***